This is an appeal from a summary judgment entered in favor of Auto Owners Insurance Company (hereinafter "Auto Owners") on Wanda Livingston's claim for damages based on an alleged bad faith failure to pay benefits under a fire insurance policy. Mrs. Livingston's claim based on breach of contract was settled shortly before trial when Auto Owners stipulated that she was entitled to a judgment as a matter of law on that claim. We reverse and remand.
Viewed most favorably to the plaintiff, the evidence before the court on the summary judgment motion would suggest the following facts:
In 1983, Wanda Livingston, who owned a house in Montgomery, purchased a second house in Tallassee, Alabama, and she and *Page 1039 
her husband, William K. Livingston, moved into that house. Sometime later, due to an automobile accident in which Mr. Livingston was injured, the Livingstons moved back to their Montgomery house so that they could be closer to Mr. Livingston's bail bond business, which was located in Montgomery. While the Livingstons initially contemplated selling the Tallassee house, they decided that they wanted to live there after retirement and decided to rent the house rather than sell it. Mrs. Livingston rented the house to Mr. and Mrs. Doug Goodwin for $600 per month.
When Mrs. Livingston first purchased the Tallassee house, she insured it through the Cousins Insurance Agency. In 1988, Cousins refused to renew the policy because the Livingstons were not occupying the house. Mrs. Livingston then contacted the Palomar Insurance Company seeking to insure the house. Mrs. Livingston informed the Palomar agent, Gayle Coltrain, that the Livingstons were not living in the Tallassee house at that time. Ms. Coltrain contacted Auto Owners to see if it would write a policy for 100% replacement cost coverage even though the Livingstons were not living in the house at the time. Auto Owners informed Ms. Coltrain that it would write such a policy. Ms. Coltrain filled out and submitted an Auto Owners application and an "Auto Owners Residential Replacement Cost Estimator" pursuant to the "Auto Owners Residential Replacement Cost Guide."
While the house had originally been insured with the Cousins Agency for $156,000, Ms. Coltrain determined that the replacement cost of the house was in excess of $186,000 and that the house had been underinsured at the previous coverage of $156,000. Ms. Coltrain submitted the application for coverage based on a $185,000 replacement cost. Auto Owners issued the policy, with an effective date of February 18, 1988. The premiums were based on the $185,000 replacement cost.
During the night of May 14, 1988, Mrs. Livingston's Tallassee house was totally destroyed by fire. At this time, the Goodwins were occupying the house. It was later determined that the fire was caused by flammable liquids that had been poured throughout the house. Mrs. Livingston was told of the fire on the morning of May 15, 1988. After visiting the scene, she notified Ms. Coltrain, who informed Auto Owners of the loss. The Auto Owners adjuster, Mr. Ken Vaughn, determined that the house was a total loss. Apparently, because of the suspicious nature of the fire and because it could not handle the investigation, Auto Owners hired an independent adjuster, an appraiser, and a fire investigator to investigate the cause of the fire and to investigate the claim filed by Mrs. Livingston. Auto Owners' own agents also did some investigation regarding the claim, and the state fire marshal also investigated the fire and its cause.
Auto Owners asked the fire investigator, Mr. Richard Keith, to conduct a "cause and origin" investigation and a full "courthouse and financial" check. Mr. Keith conducted a full investigation of the scene, which included removing debris and sending it to a testing laboratory for analysis. Mr. Keith also met with the Livingstons, who executed an authorization form allowing him access to records and information pertaining to the Livingstons' financial transactions with banks, savings institutions, governmental agencies, and creditors. While the Livingstons authorized Mr. Keith to investigate their personal affairs, Mr. Livingston would not allow an examination of records relating to his business. However, Mr. Keith never requested specific records from the Livingstons, but rather requested only that they sign the blanket authorization form.
Mr. Keith submitted several reports to Auto Owners detailing his findings. Included in these reports were recorded statements of the Livingstons and the Goodwins, diagrams of the house, and various items related to the Livingstons' finances. Mr. Keith found that while there appeared to be some items belonging to the Goodwins missing from the Tallassee house, such as guns and some clothes, there was no direct evidence that indicated that the Livingstons had started the fire. On July 6, 1988, in his final report, Mr. *Page 1040 
Keith indicated that he had completed his work and had uncovered no evidence as to who started the fire. On August 9, 1988, Mr. Keith closed his file on the matter.
The independent adjuster hired by Auto Owners, Mr. Fountain, was conducting his investigation at the same time Mr. Keith was conducting his investigation. Mr. Fountain also spoke with the Livingstons and visited and examined the burned house. He measured the house and photographed it. He determined that the house had contained 5,200 square feet. Mr. Fountain never found any evidence, and did not indicate in any of his reports that the Livingstons were responsible for the fire.
As part of his report to Auto Owners, Mr. Fountain estimated the total replacement cost of the house at $260,000. This figure was calculated by multiplying 5,200 square feet by $50, an estimated building cost per square foot. Mr. Fountain further determined the actual cash value of the house (replacement cost minus depreciation) to be $208,000. The policy issued by Auto Owners provided that if the owner decided to rebuild the house then the owner was entitled to the full replacement cost. If, however, the owner chose not to rebuild, the owner was entitled only to the cash value.
The appraiser hired by Auto Owners, Ms. O'Daniel, appraised the destroyed house as Mr. Fountain completed his work. She based her appraisal on a $40 per square foot value. Her appraisal also reduced the value of one room of the house to $15 per square foot and showed a lower total square footage than Mr. Fountain's calculations.
By July 15, 1988, the investigations of Mr. Keith and Mr. Fountain were complete. Also, on July 15, 1988, the state fire marshal completed his investigation. His report specified that the cause of the fire was incendiary, but he reported no evidence to indicate that the Livingstons were responsible. Auto Owners, nevertheless, continued its investigation. Pursuant to the request of Auto Owners' attorney, the Livingstons provided sworn statements and made certain personal financial information available to Auto Owners. Auto Owners still had no evidence indicating that the Livingstons were responsible for the fire.
On August 16, 1988, with her claim unpaid, Mrs. Livingston sued Auto Owners, alleging breach of contract, misrepresentation, and bad faith failure to pay, and seeking compensatory and punitive damages. Auto Owners petitioned to have the case removed to federal district court and filed its answer in federal court. Auto Owners counterclaimed, seeking declaratory relief in the form of an order dismissing Mrs. Livingston's complaint. The case was remanded to the state court. Once back in the state court, and before any discovery, Auto Owners filed a motion for summary judgment and a motion to stay all proceedings until the trial court could rule on the motion for summary judgment. The trial court granted the motion to stay for 30 days to allow Auto Owners to decide whether to adjust the claim or to deny payment. Auto Owners decided to proceed with adjustment of the claim.
Auto Owners' adjuster, Mr. Vaughn, offered Mrs. Livingston $138,400 based on the appraisal Auto Owners had received from Ms. O'Daniel. This figure was about $70,000 less than the value calculated by Mr. Fountain. Mrs. Livingston refused this offer.
Auto Owners then petitioned this Court for a writ of mandamus to address the following issues:
 "(1) Whether an insurer can enforce conditions precedent within its contract of insurance, particularly where the insurer is conducting a comprehensive investigation of a suspicious fire loss of incendiary origin.
 "(2) Whether, in addition to clear and unambiguous contract provisions, public policy dictates that an insurer be allowed sufficient opportunity to conduct an investigation of a suspicious fire loss, before an insured can bring a lawsuit for bad faith, fraud and breach of contract.
 "(3) Whether an insured owes the insurer a duty to cooperate in good faith while the insurer is attempting a comprehensive *Page 1041 
investigation of a suspicious fire loss of incendiary origin.
 "(4) Whether an insurer can be forced to trial defending allegations of bad faith, fraud and breach of contract, when in fact the insured has not complied with clear and unambiguous conditions precedent under a contract of insurance.
 "(5) Whether an insurer can be forced to adjust a claim and complete an investigation under the constraints of a premature lawsuit alleging bad faith, fraud and breach of contract filed prior to the claim becoming due and payable under clear and unambiguous terms of the contract of insurance.
 "(6) Whether an insurer can be compelled to respond to exhaustive discovery under constraints of a premature lawsuit alleging bad faith, fraud, and breach of contract where the insured has failed to meet its conditions precedent under the contract of insurance."
The petition was denied on August 30, 1989. Auto Owners renewed its petition for removal to federal court, which was again denied, and the case was again remanded. On February 7, 1990, the trial court granted Auto Owners' motion for summary judgment as to the bad faith claim, but denied it as to the breach of contract claim, which was set for trial. On the morning of trial, Auto Owners stipulated that Mrs. Livingston was entitled to a judgment as a matter of law on the contract claim, and it settled that claim. The trial court entered judgment on the settlement of the contract claim and made the summary judgment on the Livingstons' bad faith claim final pursuant to Rule 54(b), A.R.Civ.P.
The only issue raised on this appeal is whether the trial judge properly granted Auto Owners' motion for summary judgment. Before specifically examining the propriety of the summary judgment, we must review our prior decisions regarding the tort of bad faith failure to pay insurance benefits.
This Court has, on numerous occasions, delineated what is required of a plaintiff asserting bad faith failure to pay. The elements of a bad faith claim were most clearly set out by this Court in National Sec. Fire Cas. Co. v. Bowen, 417 So.2d 179
(Ala. 1982). In Bowen, we stated:
 "[T]he plaintiff in a 'bad faith refusal' case has the burden of proving:
 "(a) an insurance contract between the parties and a breach thereof by the defendant;
 "(b) an intentional refusal to pay the insured's claim;
 "(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
 "(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
 "(e) if intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
 "In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith
nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim."
Id. at 183. (Emphasis original.) See also Chavers v. NationalSec. Fire Cas. Co., 405 So.2d 1 (Ala. 1981). We conclude that Mrs. Livingston has established the first two elements. There is no dispute that an insurance contract existed between Mrs. Livingston and Auto Owners or that there was a breach of that contract. Just prior to the scheduled trial on the breach of contract claim, Auto Owners stipulated that Mrs. Livingston was entitled to a judgment as a matter of law on the contract claim, thereby admitting that it had breached the contract. Whether Auto Owners ever actually denied Mrs. Livingston's claim is not as clear; we conclude, however, that Auto Owners' investigative tactics amounted to a denial of the claim.
Auto Owners' investigation of Mrs. Livingston's claim consisted of work by an independent fire investigator, an independent *Page 1042 
insurance adjuster, and an independent appraiser and a consideration of the report of the state fire marshal. The investigation began after the fire on May 14, 1988, and was apparently completed around July 15, 1988. Auto Owners believed that the cause of the fire was suspicious, and its in-house adjuster, Mr. Vaughn, believed the fire was deliberately set. While the reports of Mr. Keith, Mr. Fountain, and the fire marshal all confirmed Auto Owners' belief that the fire was deliberately set, there was no evidence indicating that the Livingstons were responsible. Nevertheless, Auto Owners wanted to take sworn statements from the Livingstons, although this had been done previously both by Mr. Keith and by Mr. Fountain. Although these additional statements did not reveal any new evidence, Auto Owners continued its investigation in the hope of finding some evidence upon which it could deny the claim because it believed the fire to have been the result of arson by the Livingstons.
While Auto Owners never directly denied Mrs. Livingston's claim, the evidence was such that a jury could find that its prolonged investigation after all the facts had been gathered amounted to a last-ditch effort to find some evidence to support its suspicions that the Livingstons started the fire and, thus, to deny the claim. A jury could find that this effectively amounted to a denial of the claim. Auto Owners asserts that Mrs. Livingston's suit was premature because, it says, it had not completed its investigation when the suit was filed. However, based on the evidence a jury could find there was nothing more that Auto Owners could investigate. While we agree that Auto Owners had the right to conduct a reasonable investigation into the loss, it did not have the right to prolong the investigation and delay action in such a manner as to defeat the rights of its insured. Moreover, Auto Owners could not continue an investigation based solely on its unsupported suspicions and its hopes that it would turn up evidence that the Livingstons were responsible for the fire when nothing had been discovered that pointed to that conclusion. We hold, therefore, that under the facts of this case, a jury could find that Auto Owners' investigation was protracted and that its delay was unwarranted and amounted to a denial of Mrs. Livingston's claim.
The third element of Bowen requires that the plaintiff establish the absence of any reasonably legitimate or arguable reason for the refusal to pay. In other words, the nonpayment must be more than mere nonpayment; it must be a bad faith nonpayment. Because this case comes to us on a summary judgment in favor of Auto Owners on Mrs. Livingston's bad faith claim, we must determine whether Mrs. Livingston presented substantial evidence that Auto Owners acted in bad faith. In short, for Mrs. Livingston to defeat Auto Owners' properly supported motion, she had to produce substantial evidence of Auto Owners' bad faith failure to pay.
A.R.Civ.P. 56 sets forth the two-tiered standard for granting a motion for summary judgment. The trial court must determine: (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to a judgment as a matter of law. This standard is read in conjunction with the "substantial evidence" rule in Ala. Code 1975, § 12-21-12, for cases filed after June 11, 1987. Section 12-21-12 provides that in order to defeat a properly supported motion for summary judgment a party must present substantial evidence in support of his claim. InWest v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala. 1989), this Court defined "substantial evidence" as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." See also Bass v.Southtrust Bank of Baldwin County, 538 So.2d 794 (Ala. 1989), and Economy Fire Cas. Co. v. Goar, 551 So.2d 957 (Ala. 1989).
As we have stated, there was evidence that Auto Owners unceasingly attempted to uncover evidence that would indicate that the Livingstons were responsible for the fire. The evidence indicates that this was done even after the reports submitted by the investigators and the adjusters, as *Page 1043 
well as the state fire marshal, presented nothing to indicate culpability on the part of the Livingstons. We find no evidence in the record that could even remotely tie the Livingstons to the setting of the fire. All that Auto Owners had was its suspicions.
In the analogous case of Chavers v. National Sec. Fire Cas.Co., 405 So.2d 1 (Ala. 1981), we stated that where evidence of arson by the insured was slight, mere suspicion and speculation that new evidence will present itself at some future date is not reasonable grounds upon which to deny a claim. Specifically, we stated:
 "The mere speculation that some defensive matter could possibly emerge at trial falls short of a reasonable expectation of adducing some evidence which, if believed, would furnish a reasonable inference legally justifying the insurer's refusal to pay the claim."
Id. at 10. In the present case, there is evidence that Auto Owners followed the same practice followed by the insurer inChavers — stalling, with the hope that some evidence would be revealed to indicate that the insured was responsible for the fire.
Given the fact that Auto Owners based its denial solely on its unsupported suspicions of arson by the insured, Mrs. Livingston presented more than substantial evidence that Auto Owners' failure to pay was made in bad faith. The evidence presented by Mrs. Livingston could raise an inference that Auto Owners' denial was made in bad faith, as the facts tend to show it had no legal, justifiable, arguable, or debatable reason for the denial, and her evidence easily satisfies the substantial evidence requirement. Moreover, as we stated inChavers:
 "In the trial of a bad faith claim, it is incumbent upon the trial court . . . to determine whether the inferences which may be reasonably drawn from the plaintiff's evidence, if believed, constitute the elements of the claim. If so, the case is one for submission to the jury."
Id. at 10. While we do not presume to decide the merits of this case, the evidence presented by Mrs. Livingston substantially supported her allegation that Auto Owners acted in bad faith in denying her claim. The evidence is of such quality and weight that, if believed, it would clearly support the claim of bad faith failure to pay. That evidence must be submitted to the jury.
For the reasons set out above, the judgment is reversed and the cause is remanded for a trial on Mrs. Livingston's claim of bad faith failure to pay.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and KENNEDY and INGRAM, JJ., concur.
STEAGALL, J., concurs in the result.
MADDOX and HOUSTON, JJ., dissent.